**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**CASE NO. 0:21-cv-60643-RKA**

ZELDA BRODOWICZ, individually and on behalf
of all others similarly situated,

      Plaintiff,

v.

VIRGIN SCENT, INC. D/B/A ARTNATURALS,
INC., WALMART, INC.,

      Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Defendants Virgin Scent, Inc. d/b/a Artnaturals, Inc. ("Artnaturals") and Walmart Inc. ("Walmart") (collectively, "Defendants") respectfully request the entry of an Order dismissing Plaintiff's Class Action Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and Local Rule 7.1.  In support, Defendants state as follows:

## **INTRODUCTION**

Plaintiff's Complaint is one of three recent lawsuits filed after a private laboratory allegedly detected the presence of benzene as an impurity in certain alcohol-based hand sanitizer products. Like the other plaintiffs, Plaintiff here claims that the Artnaturals hand sanitizer products that she purchased at a Walmart location in Florida contained impermissible levels of benzene that should have been disclosed on the label.  Although Plaintiff does not allege that she actually used the products, she asserts that the Artnaturals hand sanitizer that she purchased was "worthless" due to the alleged presence of undisclosed benzene impurities.  She asserts a number of state law claims— from breach of warranty, to fraud, to negligence—all based on the fundamental allegation that the failure to include detailed testing information or the presence of benzene as an impurity on the label violates the federal Food, Drug, and Cosmetic Act ("FDCA") and is actionable under parallel state claims.  But Plaintiff is incorrect, and her Complaint must be dismissed.

*First,* all of her claims are impliedly and expressly preempted under the FDCA.  FDA has carefully and repeatedly reviewed safety information regarding alcohol-based hand sanitizers and has closely monitored the evolving science surrounding safety, testing, and impurities associated with such products.  Section 337(a) of the FDCA states that FDA, alone, is empowered to enforce alleged FDCA violations.  A private citizen cannot substitute herself for FDA and cannot assert state law claims when those claims are fundamentally based on violations that are otherwise left to FDA to enforce.  And, to the extent that Plaintiff is attempting to assert state law claims that would require Artnaturals to include information on the labels of its ethyl alcohol products that are in *addition* to the testing and information that is *actually* required by FDA, such claims are expressly preempted by Section 379(r).

*Second,* FDA has primary jurisdiction over the question of the appropriate testing and labeling of alcohol-based hand sanitizers.  FDA is currently continuing to analyze and collect data regarding the safety of such hand sanitizers, including with respect to the content of the labeling, the types of testing, and whether ethyl alcohol-based hand sanitizers are generally recognized as safe and effective.  Plaintiff's claims therefore present a question that must first be answered by

FDA before her claims can be resolved by any Court.

*Third,* Plaintiff lacks standing to represent putative class members from other states.  As a Florida resident who purchased the Artnaturals hand sanitizer at a Walmart in Florida, she certainly does not have standing to assert state law claims under the laws of "all fifty States and the District of Columbia and Puerto Rico", and there are no other named plaintiffs here—let alone one from each of the forty-nine other states and two territories at issue—to fill the gap.  As Article III standing is assessed on a defendant-by-defendant and claim-by-claim basis *prior* to the Rule 23 inquiry, all of Plaintiff's state law claims under any state or territory other than her home state of Florida must be dismissed.

*Fourth,* Plaintiff's causes of action for breach of express and implied warranties should be dismissed for failure to state a claim.  Plaintiff has failed to allege she provided Defendants with pre-suit notice.  With respect to Artnaturals specifically, Plaintiff has failed to establish privity; as for Walmart—a non-manufacturer retailer of the pre-packaged, pre-labeled products—Plaintiff has simply failed to allege any facts sufficient to show a breach of warranty.

For all of these reasons, and those discussed below, Plaintiff's Complaint must be dismissed.

## BACKGROUND

### A.  The Products At Issue and the Allegations in Plaintiff's Complaint

Plaintiff alleges that in March 2021, she purchased two bottles of Artnaturals-labeled scent-free hand sanitizer from an unspecified Walmart location in Florida.  Compl. ¶¶ 66–67.  She further claims that testing data released in March 2021 by Valisure, an online pharmacy, showed that certain Artnaturals ethyl alcohol hand sanitizer products contained undisclosed levels of benzene impurities, a known human carcinogen.  Compl. ¶ 49 (citing Valisure Citizen Petition (Mar. 24, 2020), *available at* https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Hand-Sanitizer-v4.14.pdf ("Valisure Petition")).  Although she does not allege that the specific products that she purchased were actually tested by Valisure (or anyone else, for that matter), she states in conclusory fashion that Artnaturals products sold by Walmart improperly contained benzene that was not listed as an ingredient on the product's label.  *See e.g.*, Compl. ¶ 5.

Plaintiff claims that Artnaturals "had a duty to ensure that their Hand Sanitizer Products did not contain any benzene impurities, consistent with the FDA-approved labeling" and that an "OTC drug that contains an ingredient that is different from those disclosed on the drug's label, or

at levels not disclosed on the drug's label, is a new and unapproved drug." She further asserts that "the inclusion of additional ingredients (*e.g.*, benzene) at undisclosed levels, and potentially other deviations, renders a drug unapproved, adulterated, and of lesser quality than that reflected in FDA-approved versions of the drug." Compl. ¶¶ 27–29. She characterizes the issues in the lawsuit as whether the Artnaturals hand sanitizer products sold by Walmart "contained undisclosed benzene impurities, and the levels of such impurities"; whether "Defendant violated cGMPs regarding the manufacture, sourcing, or testing of their Hand Sanitizer Product"; and whether Artnaturals and Walmart made false statements or otherwise warranted to the Plaintiff that the products were of the quality and composition represented. Compl. ¶ 85. Plaintiff further alleges that Artnaturals "did not take reasonable steps to test or otherwise assure that its Hand Sanitizer Products either did not contain any benzene . . . or did not contain benzene in excess of the FDA's interim limits." Compl. ¶ 59. Plaintiff asserts that the Artnaturals hand sanitizer that she purchased at Walmart was "worthless" due to the alleged presence of undisclosed benzene impurities. *See generally* Compl.

Based on these core allegations, Plaintiff asserts nine causes of action against both Artnaturals and Walmart[1], sounding in: (i) breach of express and implied warranties under the laws of all 50 states, Washington, D.C., and Puerto Rico (Counts One–Three); (ii) fraud and misrepresentation (Counts Four and Five); (iii) violation of the consumer protection laws of all 50 states, Washington, D.C., and Puerto Rico (Count Six); (iv) unjust enrichment (Count Seven); and (v) Negligence (Counts Eight and Nine). Compl. ¶¶ 90–176. She seeks to bring these claims individually and on behalf of a Nationwide Class of all individuals and entities in the United States and its territories and possessions who purchased a hand sanitizer product since at least January 1, 2015, as well as a Florida Subclass of all such individuals and entities in Florida during the same time period. Compl. ¶ 80.

**B. Hand Sanitizer Products Are Closely And Actively Regulated By FDA**

Plaintiff spends much of the Complaint detailing FDA's close oversight of hand sanitizer products, including the ongoing activity being undertaken by FDA. *See, e.g.,* Compl. ¶¶ 17; 25–

---

[1] As discussed in Section IV(A)(3) below, Plaintiff does not allege that Walmart took any affirmative action other than selling the product.

47.  As even Plaintiff appears to acknowledge, her claims must be viewed against the backdrop of FDA's OTC framework and its regulation of hand sanitizers.  *Id.* ¶ 3.

In 1972, FDA established a "monograph" system for regulating OTC drugs, which allows manufacturers to bypass individualized review provided that their products comply with the monograph.  *See* 37 Fed. Reg. 9464 (May 11, 1972); 21 C.F.R. § 330.10; 21 U.S.C. § 355.  Under this system, FDA issues a detailed regulation—a "monograph"—for each therapeutic class of OTC drug products.  The monograph sets forth the FDA-approved active ingredients for a given therapeutic class of OTC drugs, as well as the conditions under which each active ingredient is considered to be generally recognized as safe and effective ("GRAS/E").  *See NRDC, Inc. v. FDA*, 710 F.3d 71, 75 (2d Cir. 2013) ("Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is GRAS/E.").

As Plaintiff agrees, the ethyl alcohol-based hand sanitizers at issue are regulated by FDA as drug products.  Compl. ¶ 3.  In fact, FDA has a long history of close oversight of hand sanitizer products, beginning generally in the 1970s, followed by a June 1994 Tentative Final Monograph specific to hand sanitizers (the "1994 TFM"), 59 Fed. Reg. 31402, and thereafter by various rules, deferrals, and guidances issued throughout the years, including without limitation in **2013** (78 Fed. Reg. 76444), **2015** (80 Fed. Reg. 25166), **2016** (81 Fed. Reg. 42912), **2017** (Oct. 31, 2017, Docket No.                                   FDA-2016-N-0124,                    available                    at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm538131.htm),   **2019**   (84 Fed. Reg. 14847), **2020** (Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (COVID-19) (March 2020), *available at* https://www.fda.gov/media/136289/download; Policy for Temporary Compounding of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (March 2020), *available at* https://www.fda.gov/media/136118/download; Temporary Policy for Manufacture of Alcohol for Incorporation Into Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (COVID-19) (March 2020), *available at* https://www.fda.gov/media/136390/ download; Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers (Aug. 24, 2020); *available at* https://www.fda.gov/media/141501/download], and **2021** (Hand Sanitizers COVID-19 (Jan. 19,

2021), *available at* https://www.fda.gov/drugs/coronavirus-covid-19-drugs/hand-sanitizers-covid-19; *see also* Compl. ¶¶ 33–36.[2]

As noted, the 1994 TFM followed years of FDA activity surrounding antiseptic products, which began in the 1970s. 59 Fed. Reg. 31402, 31402–03. In the 1994 TFM, FDA classified hand sanitizer products made with ethyl alcohol as GRAS/E (*id.* at 31412), set forth detailed testing and labeling requirements for such products (*id.* at 31407), and made clear that hand sanitizer products that met those testing and labeling requirements were not misbranded (*id.* at 31403). Notably (and contrary to Plaintiff's claims), the 1994 TFM did not require that detailed testing results or impurity data be included on the label. *See generally id.* at 31407.

In 2016, after years of ongoing review and evaluation, FDA issued a proposed rule to amend the 1994 TFM "in light of more recent scientific developments and changes in the use patterns of [hand sanitizer] products" and proposed that "additional safety data are necessary to support the safety of antiseptic active ingredients for this use." 81 Fed. Reg. 42912, 42912 (the "2016 TFM"). As a result of those changes, in the 2016 TFM, FDA changed its initial determination that ethyl alcohol products were GRAS/E, and instead determined that additional studies and safety data were needed. *Id.* Therefore, the 2016 TFM did not "specifically address requirements for anticipated final formulation testing (*i.e.* testing the mixture of both active and inactive ingredients proposed for marketing) or labeling." *Id.* FDA specifically noted that "[f]inal formulation testing could potentially involve both efficacy testing and safety testing to determine absorption" and that "labeling will be addressed as part of the final rule . . . ." *Id.* FDA requested further data and information from the industry about the impact of product use and noted that improved analytical methods existed that indicated that systemic exposure may be higher than previously thought. *Id.* at 42923. It acknowledged the increased use of hand sanitizer since the 1994 TFM, but noted that it was "unaware of any information that would lead us to conclude that

---

[2] FDA publications that have been formalized and published in the Federal Register are subject to mandatory judicial notice, including on a motion to dismiss. 44 U.S.C. § 1507 ("The contents of the Federal Register *shall* be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number.") (emphasis added); *Powers v. United States*, 996 F.2d 1121, 1125 n.3 (11th Cir. 1993). Additionally, judicial notice is routinely given to FDA guidance, press releases, and other documents available on FDA's website. *Matthew v. Donald*, No. 07-cv-1801, 2007 WL 2594086, at *1–*2 (N.D. Ga. Sep. 4, 2007) (press release); *Rozelle v. Rossi*, No. 98-cv-1738, 2007 WL 2571935, at *6–*7 (W.D. Pa. Aug. 31, 2007) (safety alert on FDA's website).

any consumer antiseptic hand rub active ingredient is unsafe." *Id.* at 42914.  Instead, the Agency stated that "the benefits of any active ingredient will need to be weighed against its risks once both the effectiveness and safety have been better characterized to determine GRAS/GRAE status." *Id.* Ultimately, FDA provided detailed instructions regarding the types of safety data and testing that it needed to further evaluate the safety of hand sanitizer products, and also invited "further comment on the final formulation testing and labeling conditions proposed in the 1994 TFM, particularly in light of the data proposed in this proposed rule as necessary to support a GRAS/GRAE determination." *Id.* at 42917.  Because of the complexity of the proposed rule, FDA provided a comment period of 180 days, and stated that it would "also consider requests to defer further rulemaking with respect to a specific active ingredient for use as a consumer antiseptic rub to allow the submission of new safety or effectiveness data to the record . . . ." *Id.* at 42916.

Subsequently, in 2019, FDA issued a final rule indicating that all products covered by the 2016 TFM required the submission of a New Drug Application ("NDA") or Abbreviated New Drug Application ("ANDA") *except* for those made with ethyl alcohol, isopropyl alcohol or benzalkonium chloride (the "2019 Rule").[3]  84 Fed. Reg. 14847, 14848.  Instead, FDA "deferred further rulemaking on these three active ingredients for use in OTC consumer antiseptic rubs to allow for the development and submission to the record of new safety and effectiveness data for these three ingredients." *Id.*  The 2019 Rule described "the studies necessary as a scientific matter for the Agency to determine whether an active ingredient is GRAS/E for use in consumer antiseptic rubs" and determined that the monograph or non-monograph status of such products "will be addressed, either after completion and analysis of studies to address the safety and effectiveness data gaps of those ingredients or at another time, if these studies are not completed." *Id.* at 14851,

---

[3] An OTC drug product may be marketed in the United States in compliance with an OTC drug monograph, or under the authority of an approved product-specific NDA, or an abbreviated new drug application ("ANDA").  *See* 21 U.S.C. § 355(b)(1)–(2); § 355(j); 21 C.F.R. Part 300.  A manufacturer seeking approval of a new medication through the NDA process must submit a detailed application that includes "substantial evidence" affirmatively demonstrating the medication's safety and efficacy.  21 U.S.C. §§ 355(a), (b)(1); 21 C.F.R. §§ 314.1–314.3, 314.50.  If FDA determines, after its independent review, that the medication is safe and effective for the indication specified in the proposed label, it approves the NDA.  *See* 21 U.S.C. § 355; 21 C.F.R. § 314.105(b).  Once a drug product with an approved NDA is outside of any patent protection, generic manufacturers may also seek approval for their own versions of the original product through the abbreviated NDA ("ANDA") process, which allows the generic manufacturers to piggy-back on the scientific work previously performed.  *See* 21 U.S.C. § 355(j)(2)(A).

14861.  With respect to ethyl alcohol, specifically, FDA "explained that there had been many important scientific developments since 1994 that affected [its] evaluation of the safety of the active ingredients in consumer antiseptic rub products and that this, in turn, had caused [it] to reassess the data necessary to support a GRAS determination." *Id.* at 14854.

With respect to labeling, FDA made clear that because the three remaining active ingredients eligible for evaluation for use in consumer antiseptic rubs were granted deferrals and because FDA had not yet made a GRAS/E determination on those ingredients, it would not address their labeling in the 2019 Rule.  *Id.*  Rather, "[i]f any of the three active ingredients are subsequently found to be GRAS/GRAE, [FDA] will address the labeling for products containing that active ingredient in the applicable final monograph."  *Id.*  The 2019 Rule also did not "specifically address requirements for anticipated final formulation testing", which would instead be addressed after the ingredient was found to be GRAS/E.  *Id.* at 14856.  FDA also specifically discussed the need for further information regarding potential carcinogenicity risk for drug products that are primarily administered via topical dermal application.  *Id.* at 14858.

Since the 2019 Rule was published, and as Plaintiff has alleged, FDA has continued to closely monitor and regulate ethyl alcohol hand sanitizer products, especially in light of the increased demand for and usage of such products due to the COVID-19 pandemic.  For example, Plaintiff cites to FDA's March 2020 Temporary Policy for Preparation of Certain Hand Sanitizer Products During the Public Health Emergency (COVID-19), Guidance for Industry, which was subsequently updated on March 27, 2020, April 15, 2020, June 1, 2020, August 7, 2020, and February 2021.  Compl. ¶ 34.  Plaintiff acknowledged FDA's declaration in such documents that "it would not take regulatory action 'against firms that prepare alcohol-based hand sanitizer for consumer use and for use as health care personnel hand rubs for the duration of the public health emergency . . . ." Compl. ¶ 37.  Indeed, FDA itself has continued to update and provide detailed information regarding the testing to be conducted on alcohol-based hand sanitizers, including by developing a laboratory analytical procedure to assess the quality of finished hand sanitizer products, which FDA determined could be used to evaluate products formulated with ethyl alcohol and screen for potentially harmful impurities and to provide a methodology to help assure hand sanitizer products do not contain harmful levels of impurities.  *Id.*; Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers (Aug. 24, 2020); *available at* https://www.fda.gov/media/141501/download.

In sum, as demonstrated by the allegations in Plaintiff's Complaint and recent FDA publications, rules and guidance, FDA is actively studying and closely monitoring the safety of ethyl alcohol hand sanitizer products, including with respect to labeling and impurity testing and disclosures.  For the reasons set forth herein, Plaintiff's Complaint must be dismissed.

## LEGAL STANDARD

A court may grant a motion to dismiss a pleading if the pleading fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  On a motion to dismiss, well-pled factual allegations are taken to be true, and inferences are drawn in the plaintiff's favor.  *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).  But the court need not accept legal conclusions couched as factual allegations.  *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1273 (11th Cir. 2019); *see also Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"Under Rule 12(b)(6), dismissal is proper when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quotation marks omitted).  A "complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint."  *Quiller v. Barclays Am. Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *aff'd en banc*, 764 F.2d 1400 (11th Cir. 1985).  When "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" as required by Federal Rule of Civil Procedure 9(b).  *Dixon v. Allergan USA, Inc.*, No. 14-cv-61091, 2015 WL 12915671, at *3 (S.D. Fla. May 28, 2015).

## ARGUMENT

### I. Plaintiff's Claims Against Artnaturals and Walmart are Preempted and Must be Dismissed

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the Supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Under this provision, "state law that conflicts with federal law is without effect."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); *see also Murphy v. NCAA*, ___ U.S. ___, 138 S. Ct. 1461, 1480

(2018).  Federal preemption of state law may be express or implied.  *See Murphy*, 138 S. Ct. at 1480.  But whether express or implied, if preemption is found, then dismissal with prejudice is appropriate because any amendment would be futile.  *Cavalieri v. Avior Airlines C.A.,* No. 17-cv-22010, 2019 WL 1099860, at *2 (S.D. Fla. Mar. 8, 2019).  Courts may dismiss claims as preempted pursuant to Rule 12(b)(6).  *In re Zantac (Ranitidine) Products Liab. Litig*., MDL 2924, 2020 WL 7864213, at *25 (S.D. Fla. Dec. 31, 2020).

### A.     Plaintiff's State Law Claims Are Impliedly Preempted Because this Lawsuit Conflicts with the United States' Exclusive Jurisdiction to Enforce the FDCA

The FDCA cannot be enforced by private citizens.  Indeed, Congress provided a number of remedies for FDA enforcement in 21 U.S.C. §§ 332–335.  Congress was express that these enforcement proceedings—whether for injunction, seizure of products, or penalties—could only be pursued by the federal government:

> Except as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States . . . .

21 U.S.C. § 337(a).  Indeed, the United States Supreme Court held in *Buckman* that this provision "leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with FDCA requirements."  *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 349 n.4 (1991).

Notably, the absence of a private right of action prohibits use of state unfair competition laws "as a vehicle to bring a private cause of action that is based on violations of the FDCA."  *In re Epogen & Aranesp Off-Label Marketing & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290–91 (C.D. Cal. 2009); *Nexus Pharms. Inc. v. US Compounding Inc.*, No. 20-cv-7331, 2021 WL 342573, at *3 (C.D. Cal. Jan. 7, 2021) (unfair competition claims impliedly preempted when plaintiff essentially alleged that defendant was "not following the rules—and those rules are the FDCA rules").  Further, the federal government alone is empowered to enforce alleged violations of Current Good Manufacturing Practices ("cGMPs"), and a private cause of action based on failure to follow cGMPs is therefore also preempted.  *See Yosowitz v. Covidien LP,* 182 F. Supp. 3d 683, 698 (S.D. Tex. 2016) ("21 U.S.C. § 337(a) does not permit freestanding federal causes of action based on violation of the FDA's regulations, and there is no private cause of action for duties independently created by FDA regulations.") (internal citations and quotation marks

omitted); *Frere v. Medtronic, Inc.*, No. 15-cv-2338, 2016 WL 1533524, at *7 (C.D. Cal. 2016) ("Plaintiff['']s manufacturing defect claim is impliedly preempted under *Buckman*, because Plaintiff's entire claim rests on conduct Plaintiff claim [sic] that Defendants violated the FDA's CGMPs."); *Burkett v. Smith & Nephew Gmbh*, No. 12-cv-4895, 2014 WL 1315315, at *5 (E.D.N.Y. 2014) ("Because Burkett's manufacturing defect claim is based on violation of generally applicable CGMPs, as opposed to federal requirements specific to the R3 liner, preemption bars the claim.").

Here, Plaintiff's claims are nothing more than an attempt to evade FDA's exclusive enforcement authority under section 337 of the FDCA by burying their FDCA claims in state-law causes of action.  But a close reading of Plaintiff's claims—especially when viewed against the backdrop of FDA's close and continued focus on hand sanitizer products—shows that all of Plaintiff's claims are dependent on the FDCA and FDA regulations.  Indeed, the crux of Plaintiff's Complaint is that: (i) Artnaturals' ethyl alcohol hand sanitizer products should be considered "New, Unapproved OTC Drugs"; (ii) Artnaturals violated cGMPs regarding the manufacture, sourcing, or testing of their hand sanitizer products; and (iii) the Artnaturals products were not properly tested or labeled for impurities.  But as detailed above, FDA has been closely analyzing the safety of ethyl alcohol products, has considered the impurity and safety testing conducted to date and needed moving forward, and has affirmatively decided that ethyl alcohol products should *not* yet be considered new, unapproved products requiring an NDA or ANDA to be sold.  Under *Buckman,* and the plain language of the myriad relevant FDA TFMs and guidances, it is FDA's job to regulate, study, and enforce safety and impurity issues related to ethyl alcohol hand sanitizers.  And, it is certainly FDA's responsibility to determine whether, as Plaintiff alleges, Artnaturals complied with cGMPs.

In sum, Plaintiff is attempting to make an end-run around the fact that FDA is currently continuing to analyze and study hand sanitizers and instead, to directly enforce the terms of the FDCA herself.  But the law is clear that a private citizen cannot substitute herself for FDA. Plaintiff's claims are nothing more than a transparent attempt to evade FDA's exclusive enforcement authority under Section 337 of the FDCA.  Her Complaint must therefore be dismissed in its entirety.

**B. Plaintiff's Claims, Which All Seek Purely Economic Loss, Are Also Expressly Preempted under 379(r)**

"[E]xpress preemption exists when a statute explicitly addresses preemption." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015); *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990) (express preemption where Congress explicitly states such intention in the language of a statute). Here, the FDCA contains a particularly broad express preemption provision relating to OTC medications: 21 U.S.C. § 379r. Under the heading "National uniformity for nonprescription drugs," Section 379r mandates that, except for claims brought "under the product liability law" of any state, "no State or political subdivision of a State may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription] drug . . . ; and (2) that is *different from or in addition to*, or that is *otherwise not identical with*, a requirement under [the FDCA]." 21 U.S.C. § 379r(a),(e) (emphasis added). Section 379r also preempts any common-law duties imposed through civil damages that differ from or add to federal requirements. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324–25 (2008); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 789 (E.D. Tex. 2008). To that end, Congress provided in Section 379r(c)(2) that "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug" shall be deemed a state "requirement" that satisfies Section 379r(a). "A reasonable reading of § 379r(c)(2) is that it expands the universe of potentially preempted state law claims to include those that require additional warnings in the advertising for nonprescription drugs, and not only on the labeling." *Carter*, 582 F. Supp. 2d at 1282; *Eckler v. Neutrogena Corp.*, 238 Cal. App. 4th 433, 453, 458 (Cal. App. Ct. 2015) (same). For purposes of Section 379r, a monograph is an FDCA requirement—and a tentative final monograph does not necessarily need to be final to be enforceable. *See* 21 C.F.R. § 3370.1; *Bailey v. Rite Aid Corp.*, No. 18-cv-6926, 2019 WL 4260394 (in OTC acetaminophen case, tentative final monograph had the same force and effect as a final monograph for Section 379r purposes); 21 U.S.C. § 355h(b)(8)(A) (tentative final monographs "shall be deemed to be a final administrative order").

Here, Plaintiff appears to be asserting that the labeling and testing of Artnaturals' hand sanitizers products are subject to FDA regulation through various tentative final monographs and related FDA actions. She further appears to be relying on the 1994 TFM and the recent FDA and USP testing guidance to provide the operative testing and labeling requirements. To that end, all of Plaintiff's state law claims, which seek to recover for purported monetary losses allegedly

11

caused by her purchase of Artnaturals hand sanitizers, are expressly preempted by Section 379(r) of the FDCA. All of her claims hinge on her assertions that Artnaturals' hand sanitizer products are unsafe and that "the inclusion of additional ingredients (e.g. benzene) at undisclosed levels, and potentially other deviations" renders the drug unapproved and of lesser quality than that reflected in the versions that allegedly otherwise comply with the monograph and FDA requirements. Compl. ¶ 29. But as set forth above, FDA has been closely regulating hand sanitizers for decades, and neither the 1994 TFM, the 2016 TFM, or recent guidance have required that impurity testing results, benzene levels, or other information be disclosed on the labeling of ethyl alcohol. And, Plaintiff has not plausibly alleged that Artnaturals has not complied with the detailed testing requirements as set forth in recent guidance and the USP. Instead, through her lawsuit, Plaintiff is attempting to require that Artnaturals conduct testing and include information on the labels of its ethyl alcohol products that are different from and in addition to the testing and information that is *actually* required by FDA. Therefore, because all of her claims would require Artnaturals and Walmart to take actions that are in addition to and are not identical with the requirements of the FDCA, all of her claims are expressly preempted under 21 U.S.C. Section 379r, no matter how they are styled. *See, e.g.*, *Faustino v. Alcon Labs.*, No. 15-cv-04145, 2015 WL 12839161, at *2–*3 (C.D. Cal. Sept. 22, 2015) (finding negligent misrepresentation claim preempted where it was premised on the assertion that, through "its labels, advertisements, or other communications, [the manufacturer] misrepresented the safety of the eye drops and failed to warn of possible risks"), *aff'd on other grounds*, 692 F. App'x 819 (9th Cir. 2017); *O'Connor v. Henkel Corp.*, No. 14-cv-5547, 2015 WL 5922183, at *3 (E.D.N.Y. Sept. 22, 2015) (Section 379r bars "state law establishing or continuing any requirement for labeling or packaging 'that is different from or in addition to, or that is otherwise not identical with' a requirement of the FDCA or enumerated federal statutes" (quoting 21 U.S.C. § 379r)); *Eckler*, 238 Cal. App. 4th at 459 (claims were preempted where they alleged that sunscreen products were misleadingly labeled and marketed in violation of consumer protection statutes).

## II.    Plaintiff's Claims Against Artnaturals and Walmart Should Be Dismissed or Stayed Under the Primary Jurisdiction Doctrine

Primary jurisdiction applies where a plaintiff's claims implicate a federal agency's expertise for a regulated product. *See United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956) The primary jurisdiction doctrine applies "whenever enforcement of [a] claim requires the

resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.*; *Axiom Worldwide, Inc. v. Becerra*, No. 08-cv-918, 2009 WL 1347398 (M.D. Fla. May 13, 2009); *see also Greenfield v. Yucatan Foods, L.P.*, 18 F. Supp. 3d 1371, 1375 (S.D. Fla. 2014) ("The primary jurisdiction doctrine applies where a case implicates a federal agency's expertise with a regulated product."). Invoking the doctrine allows a court to benefit from an agency's experience and expertise, and promotes the uniform administration of the regulatory scheme administered by the agency. *See Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000). Generally, the doctrine will apply when there is (1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration. *Snyder v. Green Roads of Fla. LLC*, 430 F. Supp. 3d 1297, 1307–08 (S.D. Fla. 2020) (citation omitted).

*Snyder* provides a helpful example. In *Snyder*, a group of plaintiffs alleged that the manufacturer, distributor, and seller of various cannabis products misrepresented the amount of cannabidiol (CBD) that was actually contained in each product, and that as a result, each plaintiff was over-charged. *Id.* at 1300. Aside from the fact that the plaintiffs lacked standing to pursue class action claims based on products that they did not actually purchase, the court found that the case was best left for FDA in its primary jurisdiction over the matter. *Id.* at 1303, 1309. In particular, the court focused on FDA's ongoing rulemaking on CBD products, and recognized that FDA was "under considerable pressure from Congress and industry to expedite the publication of regulations and policy guidance regarding CBD products." *Id.* at 1307. Accordingly, there existed some level of "uncertainty with respect to whether the FDA will conclude that some or all CBD products are food additives, supplements[,] or nutrients that can be safely marketed to the public and, if nutrients, whether the labelling standards and requirements for CBD products will be different or the same as for other nutrients." *Id.* at 1308.

Considering these factors, alongside FDA's authority to regulate products containing cannabis-derived compounds and the clear need for uniformity in manufacturing and definitional standards for CBD products, the *Snyder* court invoked FDA's primary jurisdiction over the case and stayed the litigation pending further FDA guidance. *Id.* at 1309. *See also Colette v. CV Scis., Inc.*, No. 19-cv-10227, 2020 WL 2739861, at *3–*5 (C.D. Cal. May 22, 2020) (applying primary

jurisdiction and staying CBD products case given ongoing controversy over regulation of CBD products, the need for expertise and uniformity, and the likelihood that some degree of regulation/clarification was imminent); *Rosas v. Hi-Tech Pharms.*, No. 20-cv-433, 2020 WL 5361878, at *5 (C.D. Cal. July 29, 2020) (applying primary jurisdiction and dismissing case).  In deferring to FDA, the *Snyder* court, like the *Colette* and *Rosas* courts, was particularly focused on the fact that FDA was currently and actively engaged in analyzing CBD products at issue, the complexity and scientific nature of the issues to be resolved, and the fact that there were multiple similar lawsuits pending that would benefit from a uniform understanding of FDA's position on CBD products.  *See Snyder*, 430 F. Supp. at 1308 (acknowledging that the rulemaking process at the federal level was "active" and FDA "obviously has expressed an active interest in regulating" the products at issue); *Colette*, 2020 WL 2739861, at *5 (noting "several CBD-related lawsuits currently making their way through the court systems" and reasoning that "inconsistent rulings are likely to follow in the absence of FDA guidance").

 *Greenfield v. Yucatan Foods* is also illustrative.  There, the plaintiff purchased various avocado products manufactured by the defendant, including "Authentic Guacamole."  18 F. Supp. 3d at 1372.  She alleged that the defendant mislabeled its products by failing to identify sugar as an ingredient on the label—instead, the defendant identified "evaporated cane juice," a form of sugar.  *Id.* at 1373.  Thus, she claimed that the alleged mislabeling had led her to pay a premium price for the avocado products, which in fact did not satisfy minimum standards established by law, and which contained "inferior or undesirable ingredients."  *Id.*

 Although the *Greenfield* plaintiff framed her claims only in terms of state law, specifically under the Florida Deceptive and Unfair Trade Practices Act and unjust enrichment, the court invoked FDA's primary jurisdiction and stayed the case.  *Id.* at 1375–76.  Regardless of how she labeled her causes of action in the complaint, her claims all essentially "turn[ed] on whether the term 'evaporated cane juice' is false and misleading under the FDCA and its implementing regulations," and they would have required the court to consider FDA's position on evaporated cane juice.  *Id.* at 1374.  After analyzing the state of the applicable, not yet final, FDA regulations, the Court stayed the matter under the primary jurisdiction doctrine because of the "unresolved issue of food labeling law that the interpreting agency is actively considering."  *Id.* at 1375.

 The same results from *Snyder* and *Greenfield* apply here.  As in *Snyder*, there is "considerable pressure" on FDA to regulate the subject at issue.  FDA is closely regulating hand

sanitizers at the moment, not least due to the ongoing COVID-19 pandemic, and has even deferred further rulemaking on the ethyl alcohol, the active ingredient in Artnaturals sanitizers, specifically to allow for the development and submission of further safety and effectiveness data. FDA has repeatedly acknowledged the complexity and ongoing evolution of the safety issues surrounding ethyl alcohol hand sanitizers and the need for additional scientific studies. There are also multiple—and almost identical—lawsuits pending in California.

Each of the factors weighing in favor of FDA's primary jurisdiction are present here. These circumstances are ripe for FDA's primary jurisdiction, not only so FDA can apply its expertise but also for the sake of uniformity in applying these regulations. *See Boyes*, 199 F.3d at 1265. On the whole, this case belongs before FDA and should be dismissed, or at least stayed, pending further FDA guidance.

### III.   Plaintiff Does Not Have Standing To Assert Claims On Behalf of Putative Class Members From Other States

Standing is a threshold inquiry. *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)."). To establish standing, a plaintiff must show that he suffered an "injury in fact"—an invasion of a legally protected interest which is: (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the conduct complained of; the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61, 112 S.Ct. at 2136.

Plaintiff is a Florida resident who purchased Artnaturals' hand sanitizer from a Walmart in Florida (Compl. ¶¶ 7, 66), yet Plaintiff purports to assert claims under the laws of "all fifty States and the District of Columbia and Puerto Rico" for breach of express warranties (Count I), breach of implied warranties of merchantability and fitness (Count II), and violation of state consumer protection laws (Count VI). Compl. ¶¶ 96, 103, 148. This Court should dismiss for lack of standing all state law claims arising under the laws of those states in which Plaintiff does not reside.

A plaintiff's standing to pursue claims under the laws of a plaintiff's home state does not confer standing to pursue claims under the laws of other jurisdictions in which the plaintiff seeks

to represent absent class members.  *See, e.g., Weiss v. General Motors LLC*, 418 F. Supp. 3d 1173, 1181 (S.D. Fla. 2019) (concluding that plaintiff, whose claims arose only under Florida law, "lacks standing to assert claims on behalf of class members who purchased GM vehicles outside of Florida"); *Perez v. Metabolife Int'l, Inc*., 218 F.R.D. 262, 267–68 (S.D. Fla. 2003) (finding that named plaintiffs, who were all Florida residents with Florida-law claims, lacked "standing to raise questions of state law for states other than Florida" and the court lacked "jurisdiction to evaluate the law of those other states"); *Feldman v. BRP US, Inc.*, No. 17-cv-61150, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018) ("[N]amed plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that [from] which the plaintiff's own claim arises."); *In re Takata Airbag Prods. Liab. Litig*., MDL No. 2599, 2016 WL 1266609, at *4 (S.D. Fla. Mar. 11, 2016) ("A named plaintiff lacks standing to assert legal claims on behalf of a putative class pursuant to state law under which the name plaintiff's own claims do not arise."); *In re Checking Account Overdraft Litig*., 694 F. Supp. 2d 1302, 1325 (S.D. Fla. 2010) (dismissing, for lack of standing, "all state statutory claims where no named plaintiff resides in the state from which the claim is asserted"); *In re Terazosin Hydrochloride Antitrust Litig*., 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) ("[T]he named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief. Class allegations that others suffered injuries giving rise to claims 'add . . . nothing  to the question of standing.'").

Instead, Article III standing is assessed on a defendant-by-defendant and a claim-by-claim basis—and this standing analysis necessarily precedes the Rule 23 inquiry.  As the Eleventh Circuit has explained, "'[i]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.'" *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) (*quoting Prado-Steiman*, 221 F.3d at 1279) (emphasis omitted)); *see also Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others."). Moreover, a named plaintiff cannot use the hypothetical standing of absent class members as a bootstrap to confer individual standing, because putative class members are not parties to the case prior to class certification.  *See In re Checking Account Overdraft Litig*., 780 F.3d 1031, 1037 (11th Cir. 2015) ("Certification of a class is the

critical act which reifies the unnamed class members and, critically, renders them subject to the court's power."); *see also Martinez v. Wells Fargo Bank, N.A.*, 307 F.R.D. 630, 639 (S.D. Fla. 2015) ("The absent class members . . . are not before this Court until the point of certification.").

Plaintiff is a resident of Florida and allegedly purchased the product at issue from a Walmart in Florida.  There are no named plaintiffs from any other states or territories.  Plaintiff does not have standing to assert claims against Artnaturals or Walmart on behalf of absent putative class members whose claims arise under other states' laws.  These claims must be dismissed.

**IV.**     **Plaintiff Fails to Sufficiently Plead A Number Of Claims**

    **A.**     **Plaintiff's Breach of Express and Implied Warranty Claims Should Be Dismissed for Failure to State a Claim.**

Plaintiff's First and Second Causes of Action, for breach of express and implied warranties, should be dismissed because Plaintiff failed to allege she provided Defendants with pre-suit notice, and because Plaintiff has failed to establish privity with Defendant Artnaturals.  Plaintiff also failed to allege sufficient facts to establish any breach of warranty by Defendant Walmart.

    1.     Plaintiff Does Not Allege Compliance with Florida's Pre-Suit Notice Requirements

First, Plaintiff failed to allege that she provided Defendants with pre-suit notice as required by Florida law.   Section 672.607, Florida Statutes, provides that "[t]he buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Fla. Stat. § 672.607(3)(a).  "This notice requirement is a valid precondition of imposing liability on a seller of goods for breach of warranty."  *Hummel v. Tamko Bldg. Prod., Inc*., 303 F. Supp. 3d 1288, 1298 (M.D. Fla. 2017) (citations and quotation marks omitted).  Defendants are unaware of any pre-suit notice, and Plaintiff's failure to allege that she provided any such notice before filing this action warrants dismissal.  *Meyer v. Colavita USA Inc.*, No. 10-cv-61781, 2011 WL 13216980, at *5 (S.D. Fla. Sept. 13, 2011).

    2.     Plaintiff is Not in Privity with Artnaturals

Second, both of Plaintiff's warranty claims should be dismissed for lack of privity as to Defendant Artnaturals, as Plaintiff alleges she bought the product from Walmart.  Compl. ¶ 66.  "When Florida adopted the doctrine of strict liability for defective products it limited liability for breach of express or implied warranty to individuals in privity with the manufacturer."  *Amron v. Glaxosmithkline Consumer Healthcare, L.P.*, No. 11-cv-20068, 2011 WL 13223558, at *3 (S.D. Fla. June 15, 2011); *Padilla v. Porsche Cars N. Am., Inc*., 391 F. Supp. 3d 1108, 1116 (S.D. Fla.

2019) ("Time and again, Florida courts have dismissed breach of implied warranty claims under Florida law for lack of contractual privity where the plaintiff purchaser did not purchase a product directly from the defendant."); *Yvon v. Baja Marine Corp.*, 495 F. Supp. 2d 1179, 1184 (N.D. Fla. 2007) ("Privity is a requirement for an implied warranty claim, as noted above. Privity is also required for actions premised on express warranties under Florida's UCC.").  Because Plaintiff does not allege contractual privity with Artnaturals, her claims of breach of express and implied warranties should be dismissed.

3.  <u>Plaintiff Does Not Establish any Breach of Warranty by Walmart, a Retailer</u>

Plaintiff's allegations are insufficient to establish a breach of any warranty by Defendant Walmart, express or implied.  Plaintiff alleges that she and all class members "formed a contract" with both Defendants, and this supposed contract contained "promises and affirmations of fact" to which the hand sanitizer products did not conform.  Compl. ¶¶ 92, 95.  As an initial matter, and as explained in more detail above, Plaintiff's style of shotgun pleading makes it impossible for Defendant Walmart to know what "promises and affirmations" Walmart made to Plaintiff and upon which Plaintiff relies. This alone warrants dismissal.

i.    *Plaintiff Does Not Allege Sufficient Facts to Show Breach of Any Express Warranty by Walmart*

Plaintiff also does not describe or attach these "contracts" with Defendants nor does she explain the supposed warranties with sufficient detail.  *See Egbebike v. Wal-Mart Stores E., LP*, No. 13-cv-865, 2014 WL 3053184, at *5 (M.D. Fla. July 7, 2014) (dismissing breach of express warranty claim because, "upon review, the Court determines that [the plaintiff] has failed to allege any express written or oral statements by Wal-Mart which would create an express warranty.").

Assuming Plaintiff considers the label on the hand sanitizer products the "contract" here, the Complaint contains no allegations that Defendant Walmart manufactured these labels or controlled their contents in any respect.  Plaintiff actually alleges that Walmart is a retailer, *not* a manufacturer or distributor.  *See* Compl. at 13–15 (classifying Defendant Virgin Scent as the "Manufacturer/Distributor Defendant(s)" and Defendant Walmart as the "Retailer Defendant(s)").

A non-manufacturer retailer of a pre-packaged product cannot be held liable for breach of warranty claims.  *See e.g.*, *O'Neill v. Std. Homeopathic Co.*, 346 F. Supp. 3d 511, 532 (S.D.N.Y. 2018) (retailers "cannot be held liable for a breach of implied warranty of merchantability for a safety defect they could not have plausibly discovered") (citation omitted); *Porrazzo v. Bumble*

*Bee Foods, LLC*, 822 F. Supp. 2d 406, 422 (S.D.N.Y. 2011) (dismissing warranty claim against retailer because retailer is under no duty to test product in closed container). Accordingly, Plaintiff's breach of express warranty claim against Walmart fails.

> ii.    *Plaintiff Does Not Allege Sufficient Facts to Show Breach of Any Implied Warranty by Walmart*

Plaintiff's breach of implied warranty claim fares no better. Plaintiff alleges that Defendants were required to provide her with "reasonably fit Hand Sanitizer Products" and Defendants did not. Compl. ¶¶ 106, 108. Plaintiff alleges no facts to support these assertions. "To state a claim for breach of the implied warranty of merchantability, a plaintiff must *show* that the purchased product was not fit for its ordinary or intended purpose." *Varner v. Dometic Corp.*, No. 16-cv-22482, 2017 WL 3730618, at *10 (S.D. Fla. Feb. 7, 2017) (emphasis added). Plaintiff's allegations are nothing more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [which] do not suffice." *Iqbal*, 556 U.S. at 678. Further, "[a] retailer is not liable to his vendee for breach of implied warranty in the absence of knowledge of the deleterious condition of the product." *See Ratliff v. Porter Cable Co. of N.Y.*, 210 F. Supp. 957, 958–59 (E.D. La. 1962); *see also Elsroth v. Johnson & Johnson*, 700 F. Supp. 151, 160 (S.D.N.Y. 1988) ("Plaintiff's warranty claim, however, if adopted, would create that very effect by rendering retailers absolute guarantors of the products they sell. Retailers, however, are not insurers—they are retailers."). Plaintiff's warranty claims against Walmart must be dismissed.

**B.    Plaintiff's MMWA Claim Must Be Dismissed.**

In Count III, Plaintiff sues Defendants for alleged violations of the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* ("MMWA"). The MMWA provides a statutory remedy for state law express or implied warranty violations. *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1110 (S.D. Fla. 2019). To state a claim under the MMWA, a plaintiff must also state a valid state law breach of warranty claim. *Id.* at 1110–11; *Vazquez v. Gen. Motors, LLC*, No. 17-cv-22209, 2018 WL 447644, at *4 (S.D. Fla. Jan. 16, 2008) ("claims under the [MMWA] stand or fall with [a plaintiff's] express and implied warranty claims under state law"). Count III accordingly asserts MMWA liability based on alleged breaches of both express and implied warranties.

Count III should be dismissed with prejudice because Plaintiff's claims for breach of warranty are expressly preempted and otherwise fail for the reasons described above; therefore

Plaintiff cannot state valid MMWA claims tied to state law warranty claims.  Moreover, Plaintiff's claims should be dismissed because the MMWA does not apply to "written warranties" otherwise governed by federal law.  *See* 5 U.S.C. § 2311(d) ("This chapter . . . shall be inapplicable to any written warranty the making or content of which is otherwise governed by Federal law.  If only a portion of a written warranty is so governed by Federal law, the remaining portion shall be subject to this chapter.").  Applying § 2311(d), federal courts have held that the MMWA is inapplicable to both express-warranty and implied-warranty claims for products with FDA-regulated labeling. *In re Zantac (Ranitidine) Products Liab. Litig*., MDL 2924, 2020 WL 7864213, at *23 (S.D. Fla. Dec. 31, 2020) (collecting cases).  The MMWA expressly does not apply to written representations on product labeling because those statements are FDA-regulated.

Finally, Plaintiff's MMWA claim must be dismissed because Plaintiff failed to give Defendants a reasonable opportunity to cure.  Section 2310(e) of the MMWA provides that no action may be brought under 15 U.S.C. § 2310(d) for failure to comply with any obligation under any written warranty "unless the person obligated under the warranty . . . is afforded a reasonable opportunity to cure such failure to comply." 15 U.S.C. § 2310(e).  Plaintiff has not alleged that she notified Defendants of the alleged defects in its products prior to filing this suit, and as such, Plaintiff did not afford Defendants a reasonable opportunity to repair the defects.  *Burns v. Winnebago Indus., Inc*., No. 11-cv-354, 2012 WL 171088, at *4 (M.D. Fla. Jan. 20, 2012), *aff'd*, 492 F. App'x 44 (11th Cir. 2012).  Plaintiff's MMWA claim must be dismissed with prejudice.

### C.    Plaintiff's Negligence *Per Se* Claim Must Be Dismissed.

To state a claim of negligence *per se*, Plaintiff must allege that Defendants violated a regulation, that such a violation caused the type of harm that the regulation was intended to prevent, and that an injury to the class of persons intended to be protected by the regulation ensued.  *Roberts v. Victoria's Secret Stores, LLC*, No. 18-cv-61534, 2018 WL 8059094, at *3 (S.D. Fla. Dec. 3, 2018), *report and recommendation adopted*, 2018 WL 8058969 (S.D. Fla. Dec. 20, 2018). Plaintiff alleges in conclusory fashion that Defendants "failed to comply with federal cGMPs and federal adulteration standards," (Compl. ¶ 174), but fails to identify a specific regulation or standard that was violated.  This is insufficient to state a claim for negligence *per se*.  *Id.* at *3.

### V.    Conclusion

For the foregoing reasons, Defendants respectfully request the entry of an Order dismissing the Complaint, and awarding any further relief the Court deems just and proper.

Date:   June 21, 2021

Respectfully submitted,

/s/ *Laura Renstrom*

**HOLLAND & KNIGHT LLP**

Thomas J. Yoo*
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Telephone: (213) 896-2400
Facsimile:  (213) 896-2450
Thomas.Yoo@hklaw.com

Amy McVeigh*
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Telephone: (215) 252-9560
Facsimile: (215) 867-6070
Amy.McVeigh@hklaw.com

Laura B. Renstrom
50 N. Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: (904) 798-7222
Facsimile: (904) 358-1872
Laura.Renstrom@hklaw.com

Jessica Kramer
100 North Tampa Street, Suite 4100
Tampa, FL 33602
Telephone: (813) 227-8500
Facsimile: (813) 229-0134
Jessica.Kramer@hklaw.com

*Attorneys for Defendants*

* *Pro Hac Vice to be sought*